The appellant, John E. Morrow, was convicted of three counts of capital murder in connection with the death of Thomas Philyaw.[1] The murder was made capital (1) because it was committed during the course of a kidnapping in the first degree, see § 13A-5-40(a)(1), Ala. Code 1975; (2) because it was committed during the course of a robbery in the first degree, see §13A-5-40(a)(2), Ala. Code 1975; and (3) because Philyaw was in a vehicle at the time of his death, see § 13A-5-40(a)(17), Ala. Code 1975. By a vote of 8-4, the jury recommended that Morrow be sentenced to life imprisonment without the possibility of parole. The trial court overrode the jury's recommendation and sentenced Morrow to death.
Morrow raises five issues on appeal; however, because of our disposition of this case, we address only two of those issues at this time.
 I.
Citing Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242,153 L.Ed.2d 335 (2002), Morrow argues that his death sentence constitutes cruel and unusual punishment under theEighth Amendment to the United States Constitution because, he says, he is mentally retarded. (Issue II in Morrow's brief.) Although Morrow's sentencing occurred before the Supreme Court released its decision in Atkins, Morrow nevertheless argued at the sentencing hearing before the trial court that the execution of mentally retarded persons constitutes cruel and unusual punishment and that he could not be sentenced to death because he was, in fact, mentally retarded. Therefore, this issue was properly preserved for review.
In Atkins, the United States Supreme Court held: *Page 317 
 "We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty. Construing and applying the Eighth Amendment in the light of our `evolving standards of decency,' we therefore conclude that such punishment is excessive and that the Constitution `places a substantive restriction on the State's power to take the life' of a mentally retarded offender. Ford [v. Wainwright], 477 U.S. [399,] 405 [(1986)]."
536 U.S. at 317, 122 S.Ct. 2242. The Alabama Legislature has not yet enacted legislation defining mental retardation for purposes of implementing Atkins. However, as this Court recognized inStallworth v. State, 868 So.2d 1128 (Ala.Crim.App. 2003), Alabama does have the "Retarded Defendant Act," § 15-24-1 et seq., Ala. Code 1975. Section 15-24-2(3), Ala. Code 1975, defines a mentally retarded person, for purposes of the Act, as "[a] person with significant subaverage general intellectual functioning resulting in or associated with concurrent impairments in adaptive behavior and manifested during the developmental period, as measured by appropriate standardized testing instruments."[2] Moreover, in upholding the death sentence in Ex parte Perkins, 851 So.2d 453 (Ala. 2002) (opinion on remand from the United States Supreme Court), the Alabama Supreme Court applied the broadest definition of mental retardation recognized in those states that prohibit the execution of a mentally retarded defendant. The Court stated:
 "Those states with statutes prohibiting the execution of a mentally retarded defendant require that a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18)."
851 So.2d at 456. In Atkins, the Court noted that significant or substantial deficits in adaptive behavior are evidenced by "limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work." Atkins,536 U.S. at 308 n. 3, 122 S.Ct. 2242.
At the penalty phase, Morrow presented evidence, through testimony and the introduction of some of his school records, indicating that he is mentally retarded. Specifically, the evidence presented indicates that Morrow repeated the first grade three times; that he had poor grades in school; that when he was 10 years old and in the second grade he was administered the Wechsler Intelligence Scale for Children and determined to be in the "educable mentally retarded range of intellectual functioning," with a verbal IQ of 65, a performance IQ of 68, and a full-scale IQ of 64; that when he was 13 years old, he *Page 318 
was administered the Slosson Intelligence Test and determined to have an IQ of 67, although there were indications of arithmetic errors in the scoring of that test that suggested the score of 67 was "inflated"; that he suffered from "severe to moderate deficiencies" in "all areas and skills tested"; and that he was placed in special-education classes. The presentence report indicates that Morrow dropped out of school after the eighth grade.
Stanley Brodsky, a clinical and forensic psychologist, testified that he evaluated Morrow for trial, when Morrow was 32 years old, and administered the Kaufman Brief Intelligence Test ("the K-BIT"), as well as the Personality Assessment Inventory ("the PAI"). According to Dr. Brodsky, the K-BIT, although not a full-fledged IQ test, is a "screening" test designed to "estimate" a person's IQ. (R. 1065.) Dr. Brodsky testified that Morrow's score on the verbal portion of the K-BIT indicated a verbal IQ of between 53 and 65; that Morrow's score on the nonverbal portion of the K-BIT indicated a performance IQ of between 56 and 70; and that Morrow's overall score on the K-BIT indicated a full-scale IQ of between 51 and 63. Although numerically Morrow's scores fell within the moderate range of mental retardation, Dr. Brodsky said, when viewed in light of Morrow's IQ scores from the tests administered when he was child, he believed Morrow was not moderately retarded, but was "toward the bottom of the mildly mentally retarded range." (R. 1078.)
Dr. Brodsky testified that mentally retarded individuals often "learn ways of getting along with others, so the others don't know what's going on," such as pretending to understand things that are going on around them and being agreeable. (R. 1087.) During his evaluation, Dr. Brodsky said, Morrow exhibited signs indicating that he was pretending to understand things that were going on around him, when in fact he did not understand them. Dr. Brodsky also testified that people at Morrow's level of intellectual functioning have "a diminished intellectual appreciation of everything," including the wrongfulness and consequences of their actions. (R. 1094.) Dr. Brodsky also said that mildly mentally retarded individuals can have a wide range of abilities, depending on the individual person. Such activities as driving a vehicle and learning a trade are not, according to Dr. Brodsky, out of the range of ability for mildly mentally retarded individuals.
Dr. Brodsky testified that it was his opinion that Morrow was "mildly retarded" (R. 1101) and that he did not "have the ability to appreciate what's going on around him, and to assess what's going on around him, the way most people of normal intelligence would." (R. 1106.) According to Dr. Brodsky, Morrow can make statements and talk about doing things and thus appear as if he knows what he is doing, without understanding what he is actually talking about. Dr. Brodsky also testified that, in addition to IQ tests, how a person adapts to the world, i.e., adaptive functioning, is important in determining whether a person is mentally retarded, but that he did not consider or assess Morrow's day-to-day life as part of his evaluation.[3]
Joanne Terrell, a social worker, testified that she also evaluated Morrow for trial. Terrell said that she performed a "physicosocial assessment" of Morrow, which is a comprehensive examination of a person's life based on records and interviews. (R. *Page 319 
1136.) Terrell testified that records from the Department of Human Resources ("DHR") indicated that Morrow had eight siblings, three of whom had been removed from the family home by DHR due to "gross neglect and possible sexual abuse" (R. 1139); that Morrow grew up in a "sexually depraved, morally bankrupt, and emotionally bleak" environment (R. 1141); that, before they reached the age of 13, three of Morrow's sisters had been diagnosed with venereal disease "from open sores of impetigo" that had not been treated (R. 1142); that one of Morrow's sisters had been sodomized; that Morrow and his siblings were sometimes not fed and had to steal food in order to eat; that both Morrow's mother and father had been in jail at different points while he was growing up; that there had been several reports to DHR about Morrow and his siblings' being neglected; and that when DHR attempted to intervene, Morrow's parents moved. On cross-examination, however, Terrell admitted that the DHR records also showed that there had never been any allegations that Morrow had been abused, only that his sisters had; that although Morrow's parents moved often, they always cooperated with the DHR investigations; and that Morrow and his siblings reported that they had a loving relationship with their mother.
According to Terrell, because of his upbringing, Morrow did not learn how to relate to other people or how to manage his impulses; that "his ability, cognitively, intellectually, to deal with what was going on around him, was severely limited" (R. 1148); and that his social, moral, cognitive, and intellectual development was inhibited. Terrell testified that, at the age of 33, Morrow functioned at a fourth-grade level. According to Terrell, mental retardation impairs vocational skills and social skills in any situation, but in an environment such as the one in which Morrow grew up, the impairments would be even worse. Terrell said that mildly retarded individuals, such as Morrow, are often immature and unsophisticated, have poor social skills, are unable to engage in abstract thinking, such as evaluating the consequences of their actions, and have poor judgment. Terrell testified that Morrow was capable of forming a plan at about a third- or fourth-grade level, such as a plan to rob somebody to get money, but that he would be unable to engage in the abstract thinking necessary to see past the carrying out of the plan to the consequences of his actions.
The record also reflects that while he was in prison for previous convictions, Morrow had received training as an automobile mechanic;[4] that Morrow had been employed as a chainsaw operator and a farm worker in 1987 and 1988 before being incarcerated on charges unrelated to the present crime; that when Morrow was released from prison on parole in January 2000, his brother got him a job at Friese Gravel; that although Morrow lost the job with Friese Gravel after approximately two months, his brother believed it was because Morrow was "lazy" and not because he was unable to do the job (R. 1167); and that Morrow got married in July 2000, after he was released from prison, to Kathy Jones, who had three children from previous marriages. (C. 167.) In *Page 320 
addition, the circumstances surrounding the crime suggest that Morrow is not mentally retarded — the evidence presented indicates that Morrow planned the crime in advance and that he orchestrated the destruction of evidence after the crime.
In upholding the death sentence in Ex parte Perkins, the Alabama Supreme Court, after thoroughly reviewing the record to determine if there was "any inference" that Perkins was mentally retarded, found that Perkins's full-scale IQ of 76 as an adult was insufficient, without any evidence of deficits in adaptive behavior, to establish mental retardation. 851 So.2d at 455. The Alabama Supreme Court and this Court have come to a similar conclusion in other cases as well. See Ex parte Smith, [Ms. 1010267, March 14, 2003] ___ So.2d ___ (Ala. 2003) (full-scale IQ of 66 at 12 years of age with full-scale IQ of 72 as an adult and no evidence of any deficits in adaptive behavior not sufficient to warrant a remand); McGowan v. State, [Ms. CR-95-1775, December 12, 2003] ___ So.2d ___ (Ala.Crim.App. 2003) (full-scale IQ of 76 as an adult with no evidence of any deficits in adaptive behavior not sufficient to warrant a remand); Lee v. State,898 So.2d 790, 808 (Ala.Crim.App. 2003) (opinion on return to remand) (full-scale IQ of 67 as an adult with evidence suggesting the defendant was malingering and no evidence of any deficits in adaptive behavior before the age of 18 was not sufficient to warrant a remand); Peraita v. State, 897 So.2d 1161
(Ala.Crim.App. 2003), aff'd, 897 So.2d 1227 (Ala. 2004) (full-scale IQ of 75 as an adult and evidence indicating that defendant was in classes for the learning disabled not sufficient to warrant a remand); Lewis v. State, 889 So.2d 623
(Ala.Crim.App. 2003) (full-scale IQ of 58 as an adult with evidence indicating that defendant was malingering when he took the test and with evidence that defendant had a full-scale IQ of 109 only a few years earlier, and no evidence of any deficits in adaptive behavior before the age of 18 was not sufficient to warrant a remand); and Stallworth, supra (full-scale IQ of 77 as an adult was not sufficient, by itself, to warrant a remand).
In this case, however, there is more evidence than Morrow's IQ scores alone. There is some inference from the record that Morrow may, in fact, be mentally retarded under the standards set forth in Atkins and Ex parte Perkins. Morrow not only presented evidence that he had significant subaverage intellectual functioning, i.e., an IQ below 70, and that this low IQ manifested itself before he reached the age of 18,[5] but he also presented the testimony of experts who suggested that Morrow may have had some deficits in his adaptive behavior as a result of his low intellectual functioning and his home environment as he was growing up. Specifically, the testimony indicated that Morrow may have suffered limitations in, among other areas, his social and vocational skills as well as his ability to engage *Page 321 
in abstract thinking and to understand the consequences of his actions.[6] Although this testimony does not conclusively establish that Morrow suffers from significant limitations in his adaptive behavior, and there was no direct testimony that those apparent limitations manifested themselves before Morrow reached the age of 18, it is clear from our review of the record that the testimony was not offered for the purpose of establishing that Morrow was mentally retarded so as to bar imposition of the death penalty, but to establish that Morrow was unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, a statutory mitigating circumstance, see § 13A-5-51(6), Ala. Code 1975. Because Morrow was convicted and sentenced before the decision in Atkins was released, his presentation of evidence at the penalty phase of the trial was naturally focused on establishing circumstances in mitigation of the death penalty, not on establishing that he was constitutionally ineligible for the death penalty. In addition, we note that in denying Morrow's motion to declare unconstitutional the execution of mentally retarded defendants, the trial court specifically found that Morrow was "mildly retarded or educable mentally retarded." (R. 1285.) Of course, as this Court noted in Tarver v. State, [Ms. CR-00-2267, February 27, 2004] ___ So.2d ___ (Ala.Crim.App. 2004), this finding is not conclusive on the issue of Morrow's mental retardation because it was "made . . . before the United States Supreme Court issued its decision in Atkins and without the benefit of the United States Supreme Court's guidelines in that case, see Atkins,536 U.S. at 308 n. 3, or the Alabama Supreme Court's guidelines in Exparte Perkins." ___ So.2d at ___.
The record before us contains enough evidence to raise an inference that Morrow is mentally retarded, and although the record also contains contrary evidence indicating that Morrow is not mentally retarded, such conflicting evidence is better resolved by the trial court, not this Court. The record in this case is simply not sufficient for us to conclude, as both this Court and the Alabama Supreme Court have done in other cases, that Morrow is not mentally retarded. Neither can we say that Morrow is mentally retarded. Therefore, it is necessary to remand this cause for the trial court to conduct an evidentiary hearing to determine whether Morrow is mentally retarded and, thus, whether his death sentence violates the *Page 322 Eighth Amendment, and to issue specific written findings of fact in this regard.
In its decision in Atkins, the United States Supreme Court left "`to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" 536 U.S. at 317, 122 S.Ct. 2242, quoting Ford v.Wainwright, 477 U.S. 399, 405, 106 S.Ct. 2595, 91 L.Ed.2d 335
(1986). As noted above, the Alabama Legislature has not yet enacted legislation defining mental retardation for purposes of implementing Atkins. Both this Court and the Alabama Supreme Court, however, have applied in previous cases the following definition, consistent with the definition adopted by the Legislature in the Retarded Defendant Act:
 "[A] defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18)."
Ex parte Perkins, 851 So.2d at 456. The Legislature has likewise not adopted a procedure for implementing Atkins, and neither this Court nor the Alabama Supreme Court has been faced with a facially meritorious Atkins issue outside the framework of Rule 32, Ala.R.Crim.P., that warranted an evidentiary hearing. We agree with the Alabama Supreme Court that appellate courts should "refrain from making policy decisions with regard to claims of mental retardation by capital defendants." Ex partePerkins, 851 So.2d at 455 n. 1. However, this Court cannot hold death-penalty cases indefinitely; as the State has so often noted in its motions filed with this Court requesting timely disposition of death-penalty cases, justice delayed is justice denied. We must provide the trial court in this case, and trial courts in future cases, with some guidance on how to determine whether a capital defendant is mentally retarded.
Alabama's Retarded Defendant Act provides no insight as to what procedure the Legislature might adopt for implementing the constitutional restrictions on executing a mentally retarded defendant; it became law in 1985, long before Atkins was decided.[7] However, Rule 32, Ala.R.Crim.P., has a procedure for determining whether a defendant is entitled to postconviction relief, and issues relating to Atkins have been resolved in previous cases under Rule 32. See, e.g., Tarver, supra; Clemons v. State, [Ms. CR-01-1355, August 29, 2003] ___ So.2d ___ (Ala.Crim.App. 2003); and Wood v. State,891 So.2d 398 (Ala.Crim.App. 2003). Although Rule 32 was adopted by the Alabama Supreme Court as an avenue for postconviction relief, the procedure provided therein is simple and can easily be applied outside the postconviction setting to determine whether a capital defendant is mentally retarded.
Rule 32 places the burden of persuasion on the defendant to establish that he or she is entitled to an evidentiary hearing. See Rule 32.3 and Rule 32.6(b). Once the defendant meets his or her initial burden, an evidentiary hearing must be *Page 323 
held, see Rule 32.9, at which the defendant has the burden of proving by a preponderance of the evidence that he or she is entitled to relief, see Rule 32.3. Following the hearing, the trial court is required to issue specific written findings of fact regarding the defendant's claim for relief. See Rule 32.9(d). Either party may appeal the trial court's ruling in accordance with the Rules of Appellate Procedure, see Rule 32.10, and this Court will review the ruling to determine whether the trial court abused its discretion. See, e.g., Adkins v. State,930 So.2d 524, 533 (Ala.Crim.App. 2001) (opinion on return to third remand) ("We apply an abuse-of-discretion standard in evaluating the findings made by the circuit court in a Rule 32 proceeding."); Boyd v. State, 913 So.2d 1113, 1122
(Ala.Crim.App. 2003) ("where there are disputed facts in a postconviction proceeding and the circuit court resolves those disputed facts, `[t]he standard of review on appeal . . . is whether the trial judge abused his discretion when he denied the petition.' Elliott v. State, 601 So.2d 1118, 1119
(Ala.Crim.App. 1992)"); and Slaton v. State, 902 So.2d 102, 107
(Ala.Crim.App. 2003) ("When reviewing a circuit court's denial of a Rule 32 petition, this Court applies an abuse-of-discretion standard."). The procedure in Rule 32 is currently the only procedure in Alabama that has been used in implementing theAtkins decision, and it provides a suitable framework, for the time being, for addressing Atkins issues. In order to refrain from making the policy decisions necessary to adopting a specific procedure for implementing Atkins — decisions better left to the Legislature — we believe the best course of action, at least until the Legislature acts, is to use the procedure provided in Rule 32 for determining whether a capital defendant is mentally retarded, regardless of when the issue is raised.
We note that the majority of our sister states that have capital punishment have created procedures for determining whether a capital defendant is mentally retarded. Although a few have created those procedures judicially,[8] most have done so through legislation.[9] The procedures vary from state to state in the burden of proof,[10] *Page 324 
in the specificity of the procedures, and in whether the determination is made by a court or a jury, but many of the states with such procedures recognize that the issue of mental retardation should be raised as soon as practicable. As the Louisiana Supreme Court aptly noted: "The better practice underAtkins is reflected by the procedure of such states as Indiana and Missouri, where the court makes a pre-trial determination of whether the defendant is mentally retarded and thereby spares both the State and the defendant the onerous burden of a futile bifurcated capital sentencing procedure." State v. Williams,831 So.2d 835, 860 (La. 2002). Therefore, we encourage defendants to raise, and trial courts to resolve, mental-retardation issues before trial if at all possible in order to avoid the burden and expense of a bifurcated capital trial.
We do not attempt to establish today a comprehensive procedure for implementing Atkins; as noted above, the task of implementing such a procedure is better left to the Legislature. This opinion attempts only to provide some guidance to trial courts on how to determine whether a capital defendant is mentally retarded, at least until the Legislature acts. The fact that we are applying the procedure in Rule 32 to those determinations in no way suggests a stance by this Court that the Rule 32 procedure is the best procedure for implementingAtkins. It may be or it may not be; that is not for us to determine. Rather, our application of the procedure in Rule 32 to all Atkins claims, regardless of when they are raised, reflects only a desire by this Court to resolve death-penalty cases as quickly as possible and the recognition that at this time Rule 32 is the only procedure in existence that has been used to implement Atkins.
The procedure in Rule 32 is not exhaustive, and we realize that questions may arise in the future that are not answered in Rule 32 or in this opinion. Although this is the first case that presents on direct appeal from a capital conviction and sentence of death a facially meritorious Atkins claim, it certainly will not be the last. Therefore, we join the Alabama Supreme Court in urging "the Legislature to expeditiously develop procedures for determining whether a capital defendant is mentally retarded and thus ineligible for execution." Ex parte Perkins,851 So.2d at 455 n. 1. Until the Legislature acts, however, we will continue to review Atkins issues on a case-by-case basis and to apply the guidelines that have been judicially developed thus far.
For the reasons stated above, we remand this case for the trial court to determine whether Morrow is mentally retarded and, thus, whether his death sentence violates the Eighth Amendment, and to issue specific written findings of fact in that regard. On remand, the trial court shall conduct an evidentiary hearing and shall allow the parties to present any further *Page 325 
evidence regarding Morrow's intellectual functioning and adaptive behavior that may aid it in making its determination, as well as any other evidence the court deems relevant to this issue. If the court determines that further evaluations of Morrow are necessary, the court may order such evaluations on its own or at the request of either party. In determining whether Morrow is mentally retarded, the court shall consider, and issue specific written findings of fact regarding, the definition of mental retardation set forth in Atkins and Ex parte Perkins. If the court determines that Morrow is mentally retarded, it shall vacate Morrow's death sentence and resentence him to life imprisonment without the possibility of parole.
 II.
Morrow also contends that the trial court failed to state in its sentencing order the specific reasons for giving the jury's recommendation the consideration it did, as required by Ex parteTaylor, 808 So.2d 1215 (Ala. 2001). (Issue V in Morrow's reply brief.) We agree, and we also find other deficiencies in the sentencing order as well.
In Ex parte Taylor, the Alabama Supreme Court stated:
 "Under Alabama's capital-sentencing procedure, the trial judge must make specific written findings regarding the existence or nonexistence of each aggravating circumstance and each mitigating circumstance offered by the parties. § 13A-5-47(d), Ala. Code 1975. In making these findings, the trial judge must consider a jury's recommendation of life imprisonment without parole. See § 13A-5-47(e), Ala. Code 1975 (`in [weighing the aggravating and mitigating circumstances] the trial court shall consider the recommendation of the jury contained in its advisory verdict'). Construing subsection (e) together with subsection (d), we conclude that the trial judge must state specific reasons for giving the jury's recommendation the consideration he gave it. McCausland v. Tide-Mayflower Moving Storage, 499 So.2d 1378, 1382 (Ala. 1986) (stating that subsections of a statute `should be construed together to ascertain the meaning and intent of each')."
808 So.2d at 1219 (emphasis added; footnote omitted). Subsequently, in Ex parte Carroll, 852 So.2d 833 (Ala. 2002), the Alabama Supreme Court stated:
 "We take this opportunity to further explain the effect of a jury's recommendation of life imprisonment without the possibility of parole. Such a recommendation is to be treated as a mitigating circumstance. The weight to be given that mitigating circumstance should depend upon the number of jurors recommending a sentence of life imprisonment without parole, and also upon the strength of the factual basis for such a recommendation in the form of information known to the jury, such as conflicting evidence concerning the identity of the `triggerman' or a recommendation of leniency by the victim's family; the jury's recommendation may be overridden based upon information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance."
852 So.2d at 836 (footnote omitted).
In its order, the trial court stated the following regarding the jury's recommendation:
 "The Court at this time needs to address the issue of the jury's recommendation. The Court is mindful of the recommendation of the jury. The jury in this case recommended life in prison without parole by a vote of death, four, *Page 326 
life without parole, eight. The Court believes that the jury's verdict is entitled to due consideration, perhaps even certain deference. But, of course, the Court is not controlled by the recommendation of the jury.
 "The Court has found that aggravating circumstances exist in this case and that no statutory mitigating circumstances exist in this case. The Court has additionally found that other mitigating circumstances exist based upon the totality of the evidence presented during this trial, as well as any pretrial hearing or posttrial hearing.
 "The Court further finds that the jury's advisory recommendation for life in prison without parole was not influenced by prejudice or emotion. Upon weighing the aggravating circumstances against what the Court finds to be mitigating circumstances, the Court finds that the aggravating circumstances outweigh the mitigating circumstances in this case, and the jury's recommendation of Life in Prison without Parole is overridden by the Court and that the proper sentence is death."
(C. 17.) The trial court's statements that it was "mindful" of the jury's recommendation and that that recommendation was entitled to "due consideration, perhaps even certain deference" fail to satisfy Ex parte Taylor and Ex parte Carroll. The court did not state that it considered the jury's recommendation as a mitigating circumstance[11] nor did it state its specific reasons for giving the jury's recommendation the consideration it did.
In addition, in its order, the trial court stated the following regarding non-statutory mitigating circumstances:
 "The Judge, just as the jury, is entitled to consider anything, any matter that the Court might find in any way to be mitigating in order to consider the same and balance the same with the aggravating circumstances as found by the Court. There was evidence and testimony presented during the trial and sentencing phases of the Defendant's home life, early family life, lack of education and lack of a functional and traditional family unit. The Court has carefully considered all of the evidence presented during all stages of the trial in this cause, as well as the Court's observation and evidence admitted during all proceedings, pretrial and posttrial with regard to this case and the Court finds that mitigating circumstances exist with regard to this case."
(C. 17.) The trial court indicated that it found nonstatutory mitigating circumstances to exist, but it failed to identify which nonstatutory mitigating circumstances it found to exist. As this Court stated in Roberts v. State, 735 So.2d 1244
(Ala.Crim.App. 1997), aff'd, 735 So.2d 1270 (Ala. 1999):
 "In capital cases, it is the duty of this court to independently determine whether the sentence of death is appropriate in a particular case. In order to reach this conclusion, we must reweigh the *Page 327 
aggravating circumstances and the mitigating circumstances as found by the trial court."
735 So.2d at 1269 (emphasis added). See also Guthrie v. State,689 So.2d 935 (Ala.Crim.App. 1996), aff'd, 689 So.2d 951 (Ala. 1997). Although "the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating," Williams v. State, 710 So.2d 1276, 1347
(Ala.Crim.App. 1996), aff'd, 710 So.2d 1350 (Ala. 1997), in order for this Court to conduct its review of the death sentence, the trial court must specifically identify in its sentencing order those nonstatutory mitigating circumstances that it did find to exist.
Therefore, if the trial court determines on remand that Morrow is not mentally retarded and that, therefore, theEighth Amendment does not bar imposition of the death penalty, the trial court shall also (1) consider the jury's recommendation of life imprisonment without the possibility of parole as a mitigating circumstance as required by Ex parte Carroll, reweigh the aggravating and mitigating circumstances, and, if necessary, resentence Morrow; (2) amend its sentencing order to reflect its consideration of the jury's recommendation as a mitigating circumstance and to reflect the specific reasons it gave the jury's recommendation the consideration it did in light of the Alabama Supreme Court's opinions in Ex parte Carroll and Exparte Taylor; and (3) amend its sentencing order to identify the specific nonstatutory mitigating circumstances it found to exist.
Based on the foregoing, this case is remanded to the trial court for proceedings consistent with this opinion. Due return shall be filed with this Court within 98 days of the date of this opinion. We pretermit discussion of Morrow's remaining issues pending the trial court's return to our remand.
REMANDED WITH DIRECTIONS.*
McMILLAN, P.J., and COBB and WISE, JJ., concur. BASCHAB, J., recuses herself.
[1] Morrow was also indicted for three counts of conspiracy to commit capital murder; the jury acquitted him of those charges.
[2] The Retarded Defendant Act consists of seven short sections and basically authorizes the defendant or the State to file an affidavit with the trial court establishing that the defendant "is a person who has been identified as mentally retarded and [who] has received or is presently receiving services through the Department of Mental Health and Mental Retardation, a program certified by the Department of Mental Health and Mental Retardation, or the Department of Education." § 15-24-3, Ala. Code 1975. The affidavit may then be used by the parties and the court "in connection with the decisions relative to bail hearings, determination of place of detention, and ultimate disposition of such case." § 15-24-4, Ala. Code 1975.
[3] We note that the record does not indicate whether Dr. Brodsky prepared a written report of his evaluation. If he did, it is not included in the record on appeal.
[4] We note that, in its brief, the State avers that "Morrow boasted to Dr. Brodsky that he completed training as an auto mechanic while in prison." (State's brief at p. 29.) This statement is not supported by the record. Dr. Brodsky testified that Morrow had told him during the evaluation that he had received training as an auto mechanic while in prison. There was no evidence or testimony, however, that Morrow actually completed the training; in fact, Dr. Brodsky specifically testified that Morrow had only told him that he had "attended the class," not that he had actually completed the class. (R. 1104.)
[5] We note that the State argues in its brief on appeal that Morrow was tested in 1988, while he was incarcerated, and that his IQ was 93, and it attaches to its brief a report from the Alabama Department of Corrections to support that allegation. However, at oral argument, the State conceded that this report could not be considered by this Court because it was not introduced into evidence by the State during the trial, nor is it contained in the record on appeal. It is well settled that "attachments to briefs are not considered part of the record and therefore cannot be considered on appeal." Huff v. State,596 So.2d 16, 19 (Ala.Crim.App. 1991). This Court is bound by the record on appeal and cannot consider facts not contained in the record. See Smith v. State, 745 So.2d 922, 930 (Ala.Crim.App. 1999). Therefore, in deciding this issue we do not consider the State's attachment to its brief.
[6] We reject the State's argument that Morrow's pro se filing of several pretrial motions "clearly demonstrates his ability to read, write, and process information well above the level required to perform basic academics." (State's brief at p. 29.) As Morrow's counsel correctly points out in his reply brief, although Morrow's signature appears on the pro se motions, the record does not indicate whether Morrow drafted those motions on his own, whether he had help in drafting the motions, or whether someone else drafted the motions and Morrow merely signed them. We likewise reject the State's argument that Morrow's "ability to develop meaningful interpersonal relationships is aptly established by his marriage to Angela Mooney" and that "[b]y marrying [Angela Mooney] and helping to raise a small child, Morrow has demonstrated the ability to maintain close interpersonal relationships" (State's brief at p. 28-29), because this argument is not supported by the record. Although the record indicates that Morrow was living with Angela Mooney "off and on" around the time of the crime (R. 544), there is no indication in the record that Morrow was ever married to Mooney or that he ever helped raise Mooney's child. In fact, as noted above, the record reflects that in July 2000, only four months before the crime, Morrow married Kathy Jones. Mooney was known at the time of the crime as Angela Morrow; however, the record suggests that this was because she had previously been married to Morrow's brother, not because she was married to Morrow.
[7] We note that several bills have been introduced, although not passed, in the Alabama Legislature since the Atkins
decision. See House Bill 98, 2003 Regular Session; House Bill 670, 2003 Regular Session; House Bill 340, 2003 Regular Session; Senate Bill 288, 2003 Regular Session; Senate Bill 323, 2003 Regular Session; Senate Bill 25, 2004 Regular Session; and Senate Bill 31, 2004 Regular Session. Those bills provided procedures for implementing Atkins, but differ from one another in many respects. Therefore, they also provide no insight as to what procedure the Legislature might eventually adopt.
[8] See State v. Williams, 831 So.2d 835 (La. 2002); Chasev. State, 873 So.2d 1013 (Miss. 2004); State v. Lott,97 Ohio St.3d 303, 779 N.E.2d 1011 (2002); State v. Bass, 87 P.3d 629
(Okla.Crim.App. 2004); Commonwealth v. Mitchell, 576 Pa. 258,839 A.2d 202 (2003); Franklin v. Maynard, 356 S.C. 276,588 S.E.2d 604 (2003); and Hall v. State, 160 S.W.3d 24
(Tex.Crim.App. 2004).
[9] See Ariz.Rev.Stat. § 13-703.02 (2002); Ark. Code Ann. §5-4-618 (Michie 2003); Cal. Code § 1376 (West 2003); Colo.Rev.Stat. § 18-1.3-1102 (West 2002); Del. Code Ann. tit. 11, § 4209 (2003); Fla. Stat. Ann. § 921.137 (West 2001); Ga. Code Ann. § 17-7-131 (1992); Idaho Code § 19-2515A (Michie 2003); Ind. Code Ann. § 35-36-9-4 (West 1993); Md. Code Ann. [criminal law] § 2-202 (2002); Mo.Rev.Stat. § 565.030 (West 2001); Neb.Rev.Stat. § 28-105.01 (2002); Nev.Rev.Stat. 174.098 (Michie 2003); N.M. Stat. Ann. § 31-20A-2.1 (Michie 1991); N.Y. Law § 400.27 (McKinney 2001); N.C. Gen.Stat. § 15A-2005 (2001); S.D. Codified Laws § 23A-27A-26.3 (Michie 2000); Tenn. Code Ann. §39-13-203 (1993); Utah Code Ann. § 77-15a-104 (2003); Va. Code Ann. § 19.2-264.3:1.1 (Michie 2003); and Wash. Rev. Code Ann. §10.95.030 (West 1993).
[10] We note that the question whether any burden higher than a preponderance would be constitutional has been raised in other jurisdictions. In Head v. Hill, 277 Ga. 255, 587 S.E.2d 613
(2003), the Georgia Supreme Court found that mental retardation is more akin to the affirmative defense of insanity and, relying on Leland v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302
(1952), in which the United States Supreme Court held constitutional an Oregon law requiring a defendant to prove insanity beyond a reasonable doubt, held that Georgia's statutory scheme of placing the burden on the defendant to prove beyond a reasonable doubt that he or she is mentally retarded, see Ga. Code Ann. § 17-7-131 (1992), was constitutional. However, in a special concurrence to the order adopting Rule 3.203, Florida Rules of Criminal Procedure, to provide for a more comprehensive procedure for determining whether a capital defendant is mentally retarded than provided in Fla. Stat. Ann. § 921.137, one Justice of the Florida Supreme Court questioned whether the clear-and-convincing burden of proof in § 921.137 was constitutional under Cooper v.Oklahoma, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996). In Cooper, the United States Supreme Court held unconstitutional an Oklahoma law providing that a defendant must prove his incompetence by clear and convincing evidence. See Order Adopting Amendments to Florida Rules of Criminal Procedure and Florida Rules of Appellate Procedure, 875 So.2d 563 (Fla. 2004). Because we apply the procedure in Rule 32 to Atkins
claims and because that procedure uses the preponderance standard, we need not determine whether a higher standard would be constitutional.
[11] We reject the State's argument that the trial court "implicitly treat[ed] the jury's verdict as a mitigating circumstance" because it discussed the jury's recommendation immediately after it discussed the nonstatutory mitigating circumstances. (State's Response to Morrow's Reply Brief at p. 3.) The trial court's order was issued before the Supreme Court released its decision in Ex parte Carroll. Before that opinion, however, a jury's recommendation of life imprisonment without the possibility of parole did not have to be considered a mitigating circumstance. Therefore, in this case, without a direct statement by the trial court, we cannot assume that the trial court considered the jury's recommendation as a mitigating circumstance.
* Note from the reporter of decisions: On August 12, 2005, on return to remand, the Court of Criminal Appeals affirmed, without opinion. On September 2, 2005, that court denied rehearing, without opinion. On October 21, 2005, the Supreme Court denied certiorari review, without opinion (1041902).