956 So.2d 431 (2005)
Alfonzo MORRIS
v.
STATE of Alabama.
No. CR-02-1765.
Court of Criminal Appeals of Alabama.
November 23, 2005.
Rehearing Denied February 24, 2006.
Certiorari Quashed November 22, 2006.
*433 Bryan A. Stevenson and Aaryn M. Urell, Montgomery, for appellant.
Troy King, atty. gen., and Margaret Mary (Missy) Fullmer, deputy atty. gen., and Jasper B. Roberts, Jr., asst. atty. gen., for appellee.
Alabama Supreme Court 1050742.
COBB, Judge.
Alfonzo Morris was convicted by a Jefferson County jury of two counts of capital murder for the death of Miriam Rochester; he was sentenced to death. The murder was made capital because it was committed during the course of a burglary, § 13A-5-40(a)(4), Ala.Code 1975, and because it was committed during the course of a robbery, § 13A-5-40(a)(2), Ala.Code 1975. The jury recommended by a vote of 10-2 that Morris be sentenced to death. The trial court adjudicated Morris guilty of both counts of capital murder and sentenced him to death. After Morris filed a motion for new trial, the trial court conducted a hearing and denied the motion. This appeal followed.

I.
The evidence presented at trial tended to show that 85-year-old Miriam Rochester was beaten to death in her home during the commission of a burglary and a robbery on the night of February 24, 1997. Earlier that evening, at approximately 9:00 p.m., the elderly woman who shared Rochester's house, Elizabeth Russell, had fainted and Rochester had summoned emergency medical assistance. One of the paramedics who responded to the call, Juanita Patterson, testified that, while she was inside the house assessing and caring for Russell, she received information from an ambulance attendant that caused her to go outside to check on her rescue vehicle. When Patterson walked outside, she saw a man later identified as Morris walking around the rescue vehicle. He was looking into the vehicle and he placed his hand on the vehicle's door, Patterson said. Patterson said that Morris walked toward her and asked her what was going on inside the house; he asked if someone had died and he began to walk around Patterson to enter the residence. Patterson told him that everything was under control and that he did not need to go inside. Morris told her that he knew everyone in the area and insisted that he had a right to enter the house. Patterson put her hands up to prevent Morris from walking around her *434 and into the house, and Morris became "somewhat belligerent and aggravated" and he raised his voice, Patterson said. (R. 297.) Patterson told Morris to leave the premises and informed him that she would call the police if he did not leave. She said that Morris turned and walked away, muttering to himself and calling her a "bitch." Patterson testified that she was very close to Morris while they had this conversation so she was able to see him clearly. She also testified that she smelled the odor of alcohol about him.
Medical personnel placed Russell in the ambulance so she could be transported to the hospital. Patterson testified that after she administered medical care to Russell in the ambulance and stepped outside so that the ambulance could drive away, she saw Morris standing at the rear of the ambulance. Patterson said that she and her partner told Morris that they had everything under control and that he needed to leave. Instead of leaving, Patterson testified, Morris peered into the ambulance and attempted to see who was inside; he told them that he wanted to know who was inside the ambulance. When the again told Morris he needed to leave, he walked away.
Rochester telephoned one of Russell's sons, Charles Russell, at approximately 9:30 p.m. and told him that his mother had fainted and had been transported to the hospital. Charles called his brother, Daniel, and asked him to check on their mother in the hospital. At approximately 10 p.m., Charles telephoned Rochester and told her that family members were at the hospital with his mother. Daniel testified that, while he was visiting his mother in the hospital that evening, she asked him to go to the residence to be sure she had locked the back door.[1] When he got to residence at approximately 11:00 p.m., he became alarmed because the door to Russell's part of the house was open and the house appeared to have been ransacked. Daniel telephoned his brother from a neighbor's house; Daniel drove to Charles's residence and the two of them returned to Rochester's house. Charles testified that he was frightened that the burglar might still be inside the house, so they returned to Charles's house and attempted to telephone Rochester. Rochester's telephone line was busy, so they contacted the police.
Daniel and Charles returned to Rochester's house. While they were waiting for the police to arrive, Daniel looked in the front window and he saw Rochester on the floor. They telephoned the police a second time, and emergency personnel arrived soon after. Birmingham police officer Eric Smith testified that he arrived at the scene at approximately 12:15 a.m. The house had been ransacked, he said, and he discovered Rochester on the floor with head wounds. Paramedic Juanita Patterson responded to the second emergency call at Rochester's residence on the night of February 24, 1997. Officer Smith testified that, when Patterson arrived at the scene, she "broke down" and she "lost it" completely. (R. 410.) Patterson's partner entered the house and confirmed that Rochester was deceased.
Patterson did not enter the house, but, at the request of a police officer, she looked inside the house. She told the officer that, when she had been inside the house for the earlier emergency call, Rochester's side of the house had been very neat and orderly. When she saw the house during the second call, items were scattered everywhere and lamps had been *435 turned over. Patterson examined a photograph of the crime scene and testified that the rooms of the house had not been ransacked when she was there earlier that evening. Patterson told the police about her earlier encounter with Morris and she provided a description of him.
Officer Smith encountered Morris two blocks from the crime scene at approximately 5:00 a.m. Morris was staggering and appeared to be intoxicated, so Smith arrested him for public intoxication. While patting Morris down incident to the arrest, Smith discovered numerous items of costume jewelry, a cigarette, coins, and pills. Charles Russell later viewed the items of jewelry taken from Morris and he testified that he recognized many of the items because some belonged to his mother and some to Rochester.
Soon after Morris was arrested, Patterson was taken to a location in a police car and was asked if she could identify a suspect who stood outside the police car under bright lights. The suspect was Morris. She said she knew it was the person she had seen at Rochester's house, but she wanted to know if she could hear him speak. Before she completed her question to the police, Morris "began to talk and was fussing," and she knew from having seen him and having been in a confrontation with him earlier, that the man she saw under the bright lights was the man she had seen at Rochester's house. (R. 314.)
Detective Phillip Russell of the Birmingham Police Department's homicide unit testified that Officer Smith notified him that he had detained Morris for public intoxication and that Morris had items of jewelry belonging to Rochester in his possession. Russell stated that, when he saw Morris at the police department following his arrest, he determined that Morris was too intoxicated to be interrogated; Russell was afraid that Morris could not understand what Russell said to him, so he was placed in the city jail for 8 or 10 hours before he was interrogated. (R. 455.)
Further investigation revealed that Rochester's blood was on one of the shoes Morris was wearing when he was arrested. A cigarette in Morris's pocket at the time of his arrest was the same brand as the unsmoked cigarette found at the crime scene. The filter of the unsmoked cigarette recovered at the crime scene was found to contain Morris's DNA. The pathologist who performed the autopsy on Rochester determined that the 4-foot, 10-inch, 92-pound woman had sustained multiple lacerations to her head and two skull fractures, one of which was over 10 inches long. The pathologist determined that blunt-force injuries to the head caused Rochester's death.
Morris did not present any evidence on his behalf. After deliberating for 59 minutes, the jury found Morris guilty of the two counts of capital murder for which he had been indicted. A sentencing hearing was conducted, and the jury, by a vote of 10-2, recommended that Morris receive the death sentence. Following a separate hearing before the trial court, the judge sentenced Morris to death. This appeal follows.

II.
In Issue VII of his brief to this Court, Morris argues that the trial court erred to reversal when it denied his request for a mental-health expert who could assist him in preparing and presenting a defense based on the expert's evaluation of his mental-health and mental-retardation issues. He argues in Issue II of his brief that the record establishes that he is mentally retarded and that Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), mandates a reversal of his death sentence. Because the facts and law *436 relevant to the analysis of these issues are intertwined, we will discuss the issues together.
The procedural facts relevant to this issue are complicated and, therefore, are set forth in detail below.
Morris was arrested on the capital-murder charges on February 27, 1997, and he was indicted on November 7, 1997. Trial had been set for February 22, 1999. On February 10, 1999, defense counsel filed an amended plea, alleging that Morris was not guilty by reason of mental disease or defect; specifically, he alleged that Morris had been unable to appreciate the criminality of his actions at the time of the crime. Defense counsel further alleged that Morris was unable to assist counsel in the preparation of a defense. (C. 179.) Counsel also filed a motion for a psychiatric examination, seeking a determination of Morris's present competency and his mental state at the time of the offense. (C. 182-83.) In that motion, counsel alleged that Morris had a history of mental problems, that he had entered a plea of not guilty by reason of mental disease or defect, and that a mental examination was required to determine the validity of that defense. Also on February 10, 1999, counsel filed a motion for a continuance and alleged that Morris was in need of a psychiatric evaluation, which would not be completed by the trial date. (Supp. C. 41-42.)[2] On February 10, 1999, the trial court entered an order for an outpatient evaluation of Morris's competency to stand trial and his mental state at the time of the offense. (C. 71-73.) The order stated as grounds for questioning Morris's competency that Morris had a history of alcohol abuse and that he was heavily intoxicated on the date of the offense. (C. 71.) The trial court ordered Dr. Kimberly Ackerson, a certified forensic examiner who was under contract to the Alabama Department of Mental Health and Mental Retardation, to conduct the evaluation and to submit a report to the court and to the parties. (C. 2, 71-73, 2nd Supp. C. 47.)[3]
On June 28, 1999, the trial court received Dr. Ackerson's forensic evaluation report. (C. 4.) In the cover letter accompanying the report, Dr. Ackerson informed the trial court of the following:
"As stated in the report, I am of the opinion that the defendant is presently unable to participate with his attorney in preparation of his defense and/or unable to understand the nature and gravity of the charge pending against him. In my opinion, his inability to serve in such role is secondary to life-long cognitive deficits.
"As I believe this defendant to meet the requirement for mental retardation, I have referred his case to the Alabama Department of Mental Retardation for confirmation of the said diagnosis and to determine the services that this defendant may be eligible for, including competency training."
(2nd Supp. C. 46.)
Dr. Ackerson's report indicates that her opinions and conclusions were derived from collateral data provided by the prosecutor's office, including a videotaped statement Morris gave on February 25, 1997;[4] *437 Morris's school records; results from an intelligence test she administered; an interview with Morris; a form completed by defense counsel; a telephone conversation with Morris's sister; and medical records from the jail and from two hospitals where Morris had received treatment.
Dr. Ackerson reported that Morris's sister told her that their parents divorced when Morris was 9 years old, and that Morris did not cope well with the divorce. She further reported that Morris's sister told her that Morris "lost it" when their mother died in 1997. (2nd Supp. C. 50.) Dr. Ackerson reported that Morris had apparently never been able to live on his own. She reported that Morris had a family history of alcoholism. Dr. Ackerson reported that a review of Morris's school records revealed that he performed poorly in all core courses, that he was reported by his teachers to be a slow learner, and that he received "well below average" scores on a variety of achievement tests administered throughout his academic career. Morris's sister had told Dr. Ackerson that he received specialized educational services while he was in school. Dr. Ackerson reported that an intellectual assessment performed in 1967, when Morris was 6 years old, revealed that his intellectual functioning was "well below average." (2nd Supp. C. 50.)
Dr. Ackerson reported that Morris had "a long and extensive history of substance abuse." (2nd Supp. C. 50.) Morris described his alcohol abuse as "out of control" and reported that he had a history of alcoholic blackouts. He acknowledged using various drugs daily, including marijuana, cocaine, heroin, and amphetamines. Dr. Ackerman reported that medical records revealed that Morris had been treated at a hospital for a severe injury he suffered when he put his arm through a window. His blood-alcohol level at the time of treatment for that injury was over .20. (2nd Supp. C. 51.)
Dr. Ackerson reported that, while Morris was incarcerated in the county jail, she requested that he be examined by a psychiatrist. In May 1999, the psychiatrist determined that Morris was depressed and that he perhaps had some paranoid thoughts; the psychiatrist ordered that Morris receive antipsychotic medication. A few weeks later, the psychiatrist discontinued that medication after finding that Morris was not mentally ill.
Dr. Ackerson's report indicated that she interviewed Morris on two occasions and that she administered the Wechsler Adult Intelligence Scale-III (WAIS-III). Morris appeared to put forth his best effort during testing, and he was generally cooperative during the interview sessions. Morris obtained a full-scale IQ score of 53 on the WAIS-III; that score is in the moderate range of mental retardation and is well below the first percentile. (2nd Supp. C. 52.) In the portion of the report that presents the summary of the clinical assessment, Dr. Ackerson stated:
"Based on the results of the current evaluation which included observation of Mr. Morris, his self-report, family report, and results of intellectual assessment, it is my opinion that he suffers from cognitive deficits that are primarily congenitally based but may have been further exacerbated by long-term substance abuse."
(2nd Supp. C. 52.) Dr. Ackerson stated that she was referring Morris's case to the Alabama Department of Mental Health and Mental Retardation for further evaluation and for treatment recommendations.
Dr. Ackerson evaluated Morris's competency to stand trial and she determined that his ability to understand the charges against him, to assist his attorney in his own defense, and to understand the legal *438 process were very limited. She concluded that Morris did "not have sufficient knowledge to serve in the role of defendant" and that "his lack of knowledge is secondary to his below average intellectual functioning." (2nd Supp. C. 54.) She recommended that he receive competency training to "ascertain whether he could attain the necessary knowledge to serve in the role of a defendant." (2nd Supp. C. 60.)
Finally, Dr. Ackerson evaluated Morris's mental state at the time of the offense. She noted that, while Morris met the criteria for mental retardation at the time of the offense, his cognitive deficits were not so severe that he was unable to understand the nature of his actions or the difference between right and wrong. She noted, too, that even though Morris was reported to be quite intoxicated before the crime, his actions on the night of the crime were deliberate and logical. (2nd Supp. C. 53.) Pursuant to Dr. Ackerman's recommendation, Morris was evaluated by Clyde Williams of the Department of Mental Health and Mental Retardation ("DMH/MR"). On July 14, 1999, Williams reported to Dr. Ackerman as follows:
"Since a cognitive level of functioning falling within the Moderate range of mental retardation had recently been established by the results obtained from your administration of the WAIS-III, it was only necessary for me to assess Mr. Morris'[s] current level of adaptive functioning, and establish that cognitive and adaptive deficits existed during his developmental period. For these purposes I administered the AAMD Adaptive Behavior Scale (ABS). The overall score yielded by this instrument indicates that Mr. Morris'[s] current level of adaptive functioning also falls within the Moderate range of mental retardation; and reported historical information suggests that these deficits have been recognized in Mr. Morris since childhood.
"These results, then, confirm a diagnosis of Mental Retardation and establish eligibility for services through DMH/MR."
(2nd Supp. C. 69.)
Williams further stated, "It is doubtful, in my opinion, that an individual accurately diagnosed with mental retardation can attain competency or contribute in any meaningful way in their own defense." (2nd Supp. C. 69.) Nonetheless, Williams stated that every effort would be made to accommodate the court's wishes, and he recommended that Morris complete a 4  to 6-week program of competency training.
On July 23, 1999, Dr. Ackerson filed an addendum to the forensic evaluation report with the trial court. (2nd Supp. C. 61-64.)[5] Dr. Ackerson reported the findings and recommendations Williams made based on his evaluation of Morris. Dr. Ackerson concluded:
"Based on all the information available to me, Mr. Morris meets the criteria for a diagnosis of mental retardation, and he is eligible for services from the [DMH/MR]. In addition to subaverage intellectual functioning, Mr. Morris reportedly suffers from impairments in social skills and day-to-day living skills. He also has an extensive history of substance abuse. In my opinion, this defendant lacks sufficient knowledge with regard to serving in the role of a defendant and is in need of competency training. This opinion is also shared by Mr. *439 Williams from DMH/[MR] Region II-East Community Services."
(2nd Supp. C. 63.)
On November 15, 1999, the State filed a motion for a competency hearing and argued that "mild to moderate mental retardation in and of itself does not render the Defendant incompetent to stand trial." (C. 279-80.) The record does not reflect that a competency hearing was held. However, on December 13, 1999, as a result of Dr. Ackerson's diagnosis, the trial court ordered that Morris receive competency training. (C. 4.) A competency hearing was scheduled for August 7, 2000, but the record does not indicate that a hearing was held on that date. The record contains a notation dated August 29, 2000, that states, "It is ordered that Clyde Williams perform competency training on defendant Alfonso Morris." (C. 5.)
The next record notation regarding Morris's competency is dated February 21, 2001. On that date, the trial court entered an order finding Morris incompetent to stand trial and ordering Taylor Hardin Secure Medical Facility ("Taylor Hardin") to perform competency training beginning with three hour-long sessions each week. (C. 5, 283-86.) The court ordered Taylor Hardin to submit a written report to the court, the prosecutor, and defense counsel within 91 days of the initiation of treatment. The order further provided that, when Morris had attained "maximum improvement in courtroom knowledge and ability to assist his attorney in his defense," then Morris's competency to stand trial should be reevaluated by a psychiatrist or psychologist employed by Taylor Hardin. (C. 285.) Criminal proceedings against Morris were continued until he was found to be competent to stand trial. (C. 286.)
On June 22, 2001, the court received a competency evaluation report from W. Wyatt Rhone, the patient educational coordinator for Taylor Hardin. Rhone stated that Morris attended six one-hour sessions of competency training in March 2001. Morris consistently told Rhone that he did not understand why he was incarcerated, claimed that the competency education confused him, and denied being able to remember any of the material on which he had been instructed. Rhone also reported that, during a casual conversation with Morris, Morris was able to provide details about a television program he had seen. Rhone stated, "My impression is that Mr. Alfonso Morris has a great deal of court knowledge but he was not going to reveal it to me." (C. 287.)
Competency hearings were then set for July 30, 2001, and October 15, 2001, but nothing in the record indicates that the hearings took place as scheduled. (C. 5.) On November 8, 2001, the State filed a motion requesting the trial court to order an "in-house" examination by experts at Taylor Hardin to determine Morris's competency, in accordance with the court's February 21, 2001, order. (C. 290-92.) The trial court granted the motion on November 28, 2001. On December 4, 2001, the trial court entered an order committing Morris to the custody of Taylor Hardin for a determination of his competency to stand trial and, if necessary, for treatment to attain competency. (C. 294-96.)
Morris was admitted at Taylor Hardin on December 19, 2001, and he was discharged on February 1, 2002. (2nd Supp. C. 76.) A copy of the forensic evaluation report completed by Dr. Kamal Nagi, a psychiatrist and certified forensic examiner, was filed with the trial court. (2nd Supp. C. 77-85.)[6] The report indicates *440 that Morris was admitted to Taylor Hardin for treatment to restore him to competency and for a subsequent evaluation of his competence to stand trial. The report contained details of Morris's upbringing and educational history similar to the details documented in Dr. Ackerson's report. Dr. Nagi reported that Morris was in special-needs classes in school and that he began abusing drugs and alcohol at age 13, according to the report. Morris used marijuana, cocaine, heroin, and amphetamines, and he used them daily for two to three years before he was arrested. Morris drank at least a case of beer each day and reported to Dr. Nagi that he had experienced blackouts and possible seizures. (2nd Supp. C. 79-80.)
Dr. Nagi interviewed Morris twice, for a total of 4 hours and 50 minutes. Morris reported seeing shadows and hearing voices, but Dr. Nagi stated that Morris's report of hallucinations was inconsistent throughout his hospitalization. (2nd Supp. C. 81-82.) A psychological test, the TOMM,[7] was administered by a staff psychologist and, according to Dr. Nagi's report, the test indicated that Morris was exaggerating his memory impairment. Dr. Nagi reported that Morris "seems to be functioning in the borderline range" of intelligence and he stated that he believed that Morris was brighter than was indicated by Dr. Ackerson's IQ testing. (2nd Supp. C. 83.) Morris's competency to stand trial was assessed at Taylor Hardin. Morris consistently scored "0" on the competency assessment "in spite of the repeated efforts to educate him." (2nd Supp. C. 84.) Dr. Nagi reported that Morris's claimed inability to repeat simple words, to provide the name of his attorney, or to state the nature of the charges against him was inconsistent with his ability to recall details of visits he had had at Taylor Hardin and his request to a social worker that the social worker contact his sister using two telephone numbers he provided. Dr. Nagi concluded that Morris was malingering his lack of knowledge of the legal process and the charges against him. The examiner stated, "It was this examiner's opinion that he would be able to participate in legal proceedings if he chooses." (2nd Supp. C. 84.)
On July 26, 2002, the State filed a motion for a competency hearing. The competency hearing was continued several times and was eventually held on December 9, 2002. Dr. Nagi testified as the State's witness. He testified about examining Morris to determine his competency to stand trial, pursuant to the trial court's order. Dr. Nagi testified that "Mr. Ron" had attempted to provide competency education to Morris, but Morris had appeared unwilling to cooperate and scored consistently at zero. (Supp. R. 9.) Dr. Nagi referred Morris to a psychologist at Taylor Hardin, who administered the TOMM. Dr. Nagi said he was unsure what "TOMM" stood for, but, he said, "The M stands for memory." (Supp. R. 9.) The test is used to detect malingerers, he said. Dr. Nagi testified that the psychologist reported to him that Morris was exaggerating his memory loss.
Dr. Nagi testified that during his first interview, Morris reported no hallucinations but that in the second interview, he did. Morris told Dr. Nagi that the voices in his head disappeared when he turned on the radio, when someone spoke to him, and when he ingested drugs; Dr. Nagi said that these reported symptoms did not "describe any functional disorder or mental illness." (Supp. R. 12.) He concluded, *441 and he testified that "all my staff who worked with him all this time he was at the hospital" also concluded, that Morris was capable of assisting his attorney if he chose to do so.
On cross-examination, Dr. Nagi testified that he had diagnosed Morris with substance abuse and malingering. (Supp. R. 24.) He stated, "I know that he has a long history of substance abuse, can be intoxicated, and he can lose control of his temper, can lose control over everything, but after he sobers up," he can recall information, indicating that Morris "did not lose his mind completely" as a result of his drug and alcohol abuse. (Supp. R. 26.) Dr. Nagi testified that he did not review Morris's school records. "School records don't mean anything. It's an academic achievement,' he said. (Supp. R. 26.) Dr. Nagi testified that he disagreed with the opinions expressed by Dr. Ackerson and by Clyde Williams of the DMH/MR regarding Morris's mental retardation and incompetency. (Supp. R. 21, 27, 31.) Dr. Nagi testified, however, that he believed Morris was either of borderline intelligence or that he was mildly mentally retarded. (Supp. R. 32, 33.)
After Dr. Nagi testified, defense counsel requested funds to hire an independent mental-health expert to support the plea of not guilty by reason of mental disease or defect.[8] The trial court took the matter under advisement. In an order dated January 15, 2003, the trial court found Morris competent to stand trial and ordered that the case be set for trial. (C. 301.)
The case action summary indicates that the case was transferred to a different judge, who recused herself and then transferred the case to the judge who completed the proceedings. (C. 6.)[9] The judge sent a letter to defense counsel stating that the case had been set specially for trial on March 31, 2003, noting that the case was several years old and that the parties should expect trial to begin on that date. (C. 302.)
On February 12, 2003, defense counsel filed a motion for funds to hire a mental-health expert, stating that an expert was necessary to support the plea of not guilty by reason of mental disease or defect. (C. 303.) The trial court conducted a hearing on the motion on February 20, 2003. Defense counsel informed the court that Dr. Ackerson and Dr. Nagi had reached different conclusions about Morris's competency, and he argued that, in order for Morris to receive a fair trial and to support his special plea, Morris needed to be evaluated by an independent psychologist. (R. 14-15.) The trial court acknowledged that it had only recently "inherited" the case and questioned whether any of the mental-health experts had found that Morris was suffering from a mental disease. (R. 15.) The trial court stated that Dr. Ackerson had made only "a preliminary finding that possibly he may be in the low intelligence quotient that may prevent him from being competent to stand trial. And she recommended a full-blown evaluation at . . . Taylor Hardin." (R. 16.) The court further stated that Morris was kept "for several months" at Taylor Hardin, where the staff conducted "a full-blown evaluation" and determined that Morris was malingering. (R. 16.) Defense counsel then argued that Morris was entitled to an evaluation by an independent expert, not one employed at a State facility, to determine whether he was suffering from a mental defect at the time *442 of the offense. He stated that the previous evaluations had indicated, at the very least, that it was possible that Morris suffered from such a mental defect. (R. 21.) The trial court responded that defense counsel could subpoena Dr. Ackerson to testify on his behalf. Defense counsel reasserted his desire for an independent expert and argued that even Dr. Ackerson had determined that Morris was not competent to stand trial. (R. 22.)
The trial court again stated that Dr. Ackerson's determination that Morris was incompetent to stand trial was only "the preliminary finding before there was a full-blown examination at Taylor Hardin." (R. 22.) The court stated that Dr. Ackerson had only recognized "a potential problem" and had stated that an examination at Taylor Hardin was necessary "to really make a determination whether her initial findings were correct." (R. 22.) The court further stated that a team of mental-health professionals at Taylor Hardin had evaluated Morris and that Dr. Nagi was not the only one who evaluated him and reached the final diagnosis. (R. 24-25.) Defense counsel argued that, because the mental health profession is an inexact science, Morris was entitled to an evaluation by an independent expert witness who could evaluate his mental state at the time of the crime so that he could receive the fair trial that he was constitutionally guaranteed. (R. 25-26.)
The trial court and the parties discussed Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). The trial court found Ake distinguishable from Morris's case because, it said, the judgment in Ake was reversed because no mental-health expert had evaluated the defendant's mental state at the time of the offense, whereas Morris had had two evaluations at the taxpayer's expense. The court noted that both of the mental-health experts were available to the defense by subpoena. (R. 26-29.) Defense counsel argued that he was entitled to an independent expert, one not hired by the State. The court countered that, even though Dr. Nagi was employed by the State, he was an independent professional and was not biased. (R. 29-30.) Finally, defense counsel stated again that the denial of an independent expert would result in an unfair trial. (R. 30.) On February 26, 2003, the trial court denied the defense motion for funds to hire a mental-health expert. (C. 8.)
On February 28, 2003, the State filed a motion in limine seeking an order preventing Morris from presenting evidence of the IQ score of 53 as determined by Dr. Ackerson, because, it said, the evidence was not relevant to Morris's insanity defense because it did not establish that he suffered from a mental disease or defect preventing him from appreciating the nature and quality or wrongfulness of his acts, § 13A-3-1(a), Ala.Code 1975. (C. 320-24.) On March 18, 2003, the trial court held a hearing on the motion. Defense counsel argued that any denial of his right to present his insanity defense would violate his constitutional right to due process. The trial court asked, "Do you have an expert witness that's going to say that he suffered from some mental defect or disease?" (R. 48.) Defense counsel stated that they had subpoenaed Dr. Ackerson when she initially filed her report and further stated that he believed that anytime a person's mental capacity is in question, the ability to form the specific intent to commit the crime of capital murder is necessarily an issue. The trial court noted that "the full-blown examination of this defendant says he's malingering and faking it" and that no expert had testified that Morris had a mental disease or defect. (R. 49.) The court stated that its inclination was to grant the State's motion because *443 the testimony about Morris's IQ was not relevant to insanity, but it deferred ruling on the motion until trial. The court acknowledged that the evidence might be relevant as mitigation at the penalty phase if the jury found Morris guilty of capital murder.
The case proceeded to trial on March 31, 2003. Before voir dire was conducted, Morris withdrew his plea of not guilty by reason of mental disease or defect. (R. 61.) The court stated that Dr. Ackerson's findings would not be admissible in the guilt phase but that they might be admissible in the penalty phase. (R. 61-62.)
After the jury had rendered its verdict in the guilt phase and before the penalty phase of the trial began, defense counsel presented the testimony of Dr. Ackerson outside the presence of the jury "so the appellate court doesn't think we weren't doing our job in calling Dr. Ackerson as a witness in front of jury" because Dr. Ackerson's opinion had changed and that change "would hurt our client if we put this witness on the stand in front of the jury." (R. 651.) Dr. Ackerson testified as to her 1999 assessment in which she diagnosed Morris's mental retardation and noted his substance abuse and memory impairment. She testified that Morris had been committed to Taylor Hardin for competency training and that the staff at Taylor Hardin determined that Morris was malingering.
Dr. Ackerson testified that she "was provided the opportunity to review letters that I was told were written by the defendant." (R. 654; emphasis added.) She stated that the letters were not consistent with the level of intellectual functioning demonstrated during her evaluation, "because someone with that level could not have written the type and style of letters that I was provided to review." (R. 654.) The State presented Dr. Ackerson with State's Exhibits 86, 87, and 88, which are court documents and handwritten letters in Morris's state and federal court files. Dr. Ackerson testified that her review of those documents and the Taylor Hardin report had caused her to change her opinion about Morris's cognitive abilities. The prosecutor asked Dr. Ackerson whether she had assumed the documents had been written by Morris, and she replied, "Right. I did ask you specifically  that I was going to make my opinion based on the assumption that these were written and produced by the defendant, right." (R. 657.) The court asked whether the pleadings were signed by Morris, and the prosecutor stated that the pleadings were signed by Morris and that the State's expert would testify "they are signed by the defendant." (R. 657.)
The prosecutor then stated that Wyatt Rhone, the patient educational coordinator from Taylor Hardin who worked with Morris, was prepared to testify. The trial court suggested the prosecutor was "beating a dead horse" with this "non-issue." (R. 658.) The prosecutor explained that, before trial, when the State made its motion in limine seeking to exclude Dr. Ackerson's findings regarding Morris's mental retardation, it was suggested that Morris could introduce the evidence at the penalty phase. The prosecutor stated that the State was now "just keeping it out of the penalty phase." (R. 659.) The prosecutor then stated for the record that Rhone would testify that he had conducted 400 to 500 competency assessments, that Morris had scored a "0," and that he had seen a score of "0" on only 10 other occasions. (R. 660.)
The penalty phase of the trial was then held. No evidence was presented as to Morris's level of intellectual functioning. The jury recommended that Morris receive the death sentence, and the trial *444 court imposed the death sentence. In its sentencing order, the trial court did not find any mitigating circumstances related to Morris's mental health or intellectual functioning.
The procedural facts that occurred before and during trial have been set forth in detail because they are complex and because the detailed background information is necessary to the understanding of our holding. For the reasons expressed below, we conclude that the trial court erred to reversal when it denied Morris's request for funds to hire an independent mental-health expert.
A. Ake v. Oklahoma
The United States Supreme Court, in Ake v. Oklahoma, 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), held that, when an indigent defendant makes a preliminary showing that his mental condition at the time of the offense is likely to be a significant factor at trial, due process requires that, at a minimum, a state provide access to a competent psychiatrist who will evaluate the defendant "and assist in evaluation, preparation, and presentation of the defense" at the guilt phase and at sentencing. The Court began its analysis by stating, "This Court has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense." 470 U.S. at 76, 105 S.Ct. 1087. "[A] criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense." 470 U.S. at 77, 105 S.Ct. 1087.
The Court stated that three factors are relevant to determining "whether, and under what conditions, the participation of a psychiatrist is important enough to preparation of a defense to require the State to provide an indigent defendant with access to competent psychiatric assistance in preparing the defense." Id. The three factors are the private interest affected by the State's action, the governmental interest that would be affected if the expert were provided, and the probable value of the psychiatric assistance versus the risk of error in the proceeding if the assistance is denied. The Court observed as to the first factor, "The private interest in the accuracy of a criminal proceeding that places an individual's life or liberty at risk is almost uniquely compelling." 407 U.S. at 78, 92 S.Ct. 1983. The Court stated that the individual's interest in the State's attempt to convict him weighed heavily in the analysis. As to the second factor, the Court could identify only the State's financial interest weighing against the provision of a psychiatrist, and it found that interest to be insubstantial. The Court found that the State could "not legitimately assert an interest in the maintenance of a strategic advantage over the defense, if the result of that advantage is to cast a pall on the accuracy of the verdict obtained." 470 U.S. at 79, 105 S.Ct. 1087. As to the third factor, the Court noted, initially, that psychiatric assistance had come to play a pivotal role in criminal proceedings. It noted that a majority of states and the federal government had decided that, in certain circumstances, an indigent defendant was entitled to psychiatric assistance to secure an adequate defense. The Court recognized the extensive tasks that psychiatrists had come to complete at criminal trials:
"[W]hen the State has made the defendant's mental condition relevant to his criminal culpability and to the punishment he might suffer, the assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense. *445 In this role, psychiatrists gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury; they analyze the information gathered and from it draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder on behavior; and they offer opinions about how the defendant's mental condition might have affected his behavior at the time in question. They know the probative questions to ask of the opposing party's psychiatrists and how to interpret their answers. Unlike lay witnesses, who can merely describe symptoms they believe might be relevant to the defendant's mental state, psychiatrists can identify the `elusive and often deceptive' symptoms of insanity, Solesbee v. Balkcom, 339 U.S. 9, 12 (1950), and tell the jury why their observations are relevant. Further, where permitted by evidentiary rules, psychiatrists can translate a medical diagnosis into language that will assist the trier of fact, and therefore offer evidence in a form that has meaning for the task at hand. Through this process of investigation, interpretation, and testimony, psychiatrists ideally assist lay jurors, who generally have no training in psychiatric matters, to make a sensible and educated determination about the mental condition of the defendant at the time of the offense."
470 U.S. at 80-81, 105 S.Ct. 1087.
Additionally, the Court noted:
"By organizing a defendant's mental history, examination results and behavior, and other information, interpreting it in light of their expertise, and then laying out their investigative and analytic process to the jury, the psychiatrists for each party enable the jury to make its most accurate determination of the truth on the issue before them. It is for this reason that States rely on psychiatrists as examiners, consultants, and witnesses, and that private individuals do as well, when they can afford to do so. In so saying, we neither approve nor disapprove the widespread reliance on psychiatrists but instead recognize the unfairness of a contrary holding in light of evolving practice."
470 U.S. at 81-82, 105 S.Ct. 1087 (footnote omitted).
Following its discussion of the pivotal role played by psychiatrists at criminal trials, quoted above, the Court stated:
"The foregoing leads inexorably to the conclusion that, without the assistance of a psychiatrist to conduct a professional examination on issues relevant to the defense, to help determine whether the insanity defense is viable, to present testimony, and to assist in preparing the cross-examination of a State's psychiatric witnesses, the risk of an inaccurate resolution of sanity issues is extremely high. With such assistance, the defendant is fairly able to present at least enough information to the jury, in a meaningful manner, as to permit it to make a sensible determination."
470 U.S. at 82, 105 S.Ct. 1087 (emphasis added).
Noting that the risk of error from the denial of psychiatric assistance was highest when the defendant's mental condition was seriously in question, the Court recognized that "a defense may be devastated by the absence of a psychiatric examination and testimony." 470 U.S. at 83, 105 S.Ct. 1087. The Court then detailed the relevant factors in Ake's case, including that Ake's sole defense had been insanity, that he had been found incompetent to stand trial and had been committed for treatment, that psychiatrists who had examined him for competency suggested that Ake's mental illness might have begun years earlier, and *446 that state law recognized an insanity defense and placed the initial burden of producing evidence on the defendant. 470 U.S. at 86, 105 S.Ct. 1087. These factors led the Court to conclude that Ake's mental state at the time of the offense was a substantial factor in his defense and, therefore, that the trial court's denial of his request for the assistance of a psychiatrist deprived Ake of due process. The Court also noted that, because psychiatric testimony about Ake's future dangerousness was an issue at sentencing, denying Ake a psychiatrist to assist him with his defense as to that issue also constituted a due-process deprivation.
B. Trial court's application of Ake v. Oklahoma
The record reflects that Morris's case was assigned to the judge who tried the case only after the judge to whom it had been assigned and who had presided over the years of pretrial proceedings related to Morris's incompetency retired and after a second judge recused herself from the case. The newly assigned judge apparently misunderstood the proceedings and evaluations that had taken place before the case was assigned to him. This series of misunderstandings related to the competency proceedings and the court's misapplication of the principles of Ake v. Oklahoma resulted in a denial of Morris's due-process rights.
At the February 20, 2003, hearing on the motion for expenses to hire an independent psychologist or psychiatrist  the first hearing the trial judge held after the case was transferred to him  the court repeatedly stated that Dr. Ackerson had conducted only a "preliminary" evaluation of Morris and that Taylor Hardin staff members had conducted a "full blown evaluation" of Morris. Both assertions are inaccurate, and significantly so. Dr. Ackerson was appointed by the court to assess Morris's competency to stand trial and his mental state at the time of the offense; she evaluated Morris and submitted her report to the court. Based on her finding that Morris was functioning in the moderate range of mental retardation, Dr. Ackerson referred Morris to DMH/MR so that staff members there could confirm the diagnosis and provide treatment recommendations. Clyde Williams of DMH/MR evaluated Morris's adaptive functioning and confirmed Dr. Ackerson's diagnosis that Morris's mental retardation was in the moderate range and had been recognized since childhood. Nothing in these reports suggests that Dr. Ackerson's evaluation and diagnosis were preliminary. To the contrary, the trial court's initial order that Morris receive competency training was based solely on Dr. Ackerson's diagnosis. (C. 4.) Based on Dr. Ackerson's diagnosis that Morris's full-scale IQ score was 53 and her recommendation that Morris receive competency training, the trial court later found Morris incompetent to stand trial and ordered DMH/MR to provide additional competency training to Morris. (C. 283-286.) Furthermore, the only IQ score in the record before us is the one obtained and reported by Dr. Ackerson in 1999.[10]
At the February 20, 2003, hearing, the trial court mistakenly stated that, following Dr. Ackerson's "preliminary investigation," the court had "ordered [Morris] to Taylor Hardin for a full-blown examination." (R. 17.) Again, the trial court was mistaken. The record clearly reflects that Morris was committed to Taylor Hardin in *447 2001 only for the purpose of receiving competency training and a competency evaluation. (C. 5, 78, 294.) Dr. Nagi's forensic evaluation report states that Morris was admitted to Taylor Hardin "for treatment of an incompetent defendant to be restored to competence and subsequent evaluation of his competence to stand trial. . . ." (C. 78.) The only psychological test administered at Taylor Hardin, according to Dr. Nagi, was the TOMM; Dr. Nagi did not know what the initials of the test were an acronym for, but he stated that it was a memory test and a test to assist in determining whether the taker was malingering.[11] Thus, the trial court incorrectly believed that Morris had received a "full blown" evaluation at Taylor Hardin; Dr. Ackerson had conducted only a "preliminary investigation." Neither of the court's assumptions about the evaluations was correct.
Even if Dr. Ackerson had performed only a preliminary evaluation and had made only a preliminary diagnosis that Morris was functioning in the moderate range of mental retardation, however, and even if Taylor Hardin had performed a complete evaluation to determine Morris's competency at the time of trial and his mental state at the time of the offense, Morris would have been entitled under due-process principles to the appointment of an independent mental-health professional to assist him in his defense. To the extent the trial court believed that mental-health evaluations performed for the court, the results of which were made available to the parties, always satisfied due-process requirements, the trial court misunderstood the holding of Ake v. Oklahoma.
As the Supreme Court made clear in the portions of Ake quoted above in this opinion, when an indigent defendant makes a preliminary showing that his mental health is likely to be a significant factor at trial, due process requires that the State provide access to a psychiatrist's assistance. Morris was entitled to "the assistance of a psychiatrist to conduct a professional examination on issues relevant to the defense, to help determine whether the insanity defense is viable, to present testimony, and to assist in preparing the cross-examination of the State's psychiatric witnesses." Ake v. Oklahoma, 470 U.S. at 82, 105 S.Ct. 1087 (emphasis added). The trial court apparently believed that the evaluations by Dr. Ackerson and Taylor Hardin satisfied the Ake requirements. We disagree. The fundamental holding of Ake involved a defendant's receiving assistance from an independent expert who could "assist in evaluation, preparation, and presentation of a defense." 470 U.S. at 83, 105 S.Ct. 1087. Dr. Ackerson's and Dr. Nagi's evaluations were conducted at the court's request, and the reports of the evaluations were submitted to the court and to both parties. In no sense did these evaluations satisfy the intent expressed by the Supreme Court in Ake.
To the extent that the trial court believed that Dr. Nagi was a neutral expert and that, therefore, Ake was satisfied, we disagree. As noted above, the Supreme Court made it clear that, once an indigent defendant had established that his sanity was likely to be a significant issue at trial, he is entitled to an independent expert  *448 an expert devoted to assisting his defense and one who is not providing the same information or advice to the court and to the prosecution. One of the most crucial decisions a defense expert can provide assistance with is whether a mental-health defense is viable and, if so, how best to present it to the jury. Certainly, it is unreasonable to expect that a neutral expert who reports to the court and to the parties would provide the same degree of assistance to a defendant as could be expected from the defendant's own independent expert. The Supreme Court in Ake stated:
"Psychiatry is not, however, an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, on cure and treatment, and on likelihood of future dangerousness. Perhaps because there often is no single, accurate psychiatric conclusion on legal insanity in a given case, juries remain the primary factfinders on this issue, and they must resolve differences in opinion within the psychiatric profession on the basis of the evidence offered by each party. When jurors make this determination about issues that inevitably are complex and foreign, the testimony of psychiatrists can be crucial and a `virtual necessity if an insanity plea is to have any chance of success.' By organizing a defendant's mental history, examination results and behavior, and other information, interpreting it in light of their expertise, and then laying out their investigative and analytic process to the jury, the psychiatrists for each party enable the jury to make its most accurate determination of the truth on the issue before them. It is for this reason that States rely on psychiatrists as examiners, consultants, and witnesses, and that private individuals do as well, when they can afford to do so." 470 U.S. at 81-82, 105 S.Ct. 1087 (footnotes omitted)(emphasis added).
In Smith v. McCormick, 914 F.2d 1153 (9th Cir.1990), the defendant objected when the trial court ordered a psychiatrist to examine him and to submit the report to the court; he had requested the assistance of an independent psychiatrist to assist him in preparing his mitigation case at his capital-sentencing hearing. The trial court denied the defense requests for an independent expert and the United States Court of Appeals for the Ninth Circuit reversed. The Court stated:
"The right to psychiatric assistance does not mean the right to place the report of a `neutral' psychiatrist before the court; rather it means the right to use the services of a psychiatrist in whatever capacity defense counsel deems appropriate  including to decide, with the psychiatrist's assistance, not to present to the court particular claims of mental impairment."
914 F.2d at 1157.
Cowley v. Stricklin, 929 F.2d 640 (11th Cir.1991), lends additional support to Morris's claim that the trial court's ruling resulted in a denial of his due-process rights. In Cowley, defense counsel requested psychiatric assistance and a mental-health evaluation based on Cowley's bizarre behavior. Before allowing the motion, the trial court ordered that Cowley be evaluated at a local mental-health center. The psychiatrist who evaluated Cowley reported to the court and the parties that Cowley was competent to stand trial and that he had been responsible for his actions at the time of the offense. The trial court denied defense counsel's repeated motions for assistance from a mental health professional, even though the record contained evidence indicating that Cowley had been institutionalized *449 repeatedly for mental problems and that he was taking antipsychotic medication. On appeal from the denial of petition for federal habeas relief, the United States Court of Appeals for the Eleventh Circuit held that, even though there had been some evidence indicating that Cowley was sane, there was ample evidence indicating that he was not and that Cowley had been entitled to the assistance of his own expert. The fact that the court's expert, Dr. Habeeb, had been "independent," was not sufficient to satisfy Ake, the Court held:
"The district court found that Dr. Habeeb was a `qualified,' `independent psychiatrist.' This may have been the case, but Dr. Habeeb did not provide the constitutionally requisite assistance to Cowley's defense. Ake holds that psychiatric assistance must be made available for the defense. This assistance may include conducting `a professional examination on issues relevant to the defense,' presenting testimony, and assisting `in preparing the cross-examination of a State's psychiatric witnesses.' Dr. Habeeb performed none of these essential tasks on Cowley's behalf. Dr. Habeeb was called by the prosecution and testified against Cowley at both the competency hearing and the trial. His testimony was that he had examined Cowley and found him to be competent and that Cowley showed no signs of schizophrenia or other evidence of insanity at the time of the crime. Dr. Habeeb did not assist in Cowley's trial preparation and obviously could not have assisted Cowley in his own cross-examination."
929 F.2d at 644 (quoting Ake) (footnote omitted). After noting that, in Alabama, the law places the burden of proof on the defendant, the Court stated, "It was impossible for Cowley to meet this heavy burden, but not because he was insufficiently disturbed. The state of Alabama made it impossible for Cowley to meet this burden by refusing to provide an independent mental health professional who could evaluate Cowley's sanity at the time of the assault." 929 F.2d at 645.
We agree with the rationale expressed in the foregoing cases. We hold that, even if Morris had received a "full blown" psychiatric evaluation at Taylor Hardin, that evaluation would not have satisfied the requirements of Ake. Moreover, the record indicates that Morris did not receive a "full blown" psychiatric evaluation at Taylor Hardin because the scope of the trial court's order was far more limited; Morris was sent to Taylor Hardin to receive competency training and a reevaluation, and the results of that evaluation were reported directly to the court. In no sense did this satisfy the requirements of Ake. We note, furthermore, that the two experts who had evaluated Morris and reported to the court had reached inconsistent results. Especially in light of this inconsistency between the two experts, due process required the appointment of an independent mental-health expert to assist Morris. Only with the assistance of a defense expert would Morris have been able to reconcile the inconsistent results, determine whether a mental health defense was viable and, if so, how to present it effectively, and how to effectively cross-examine the State's expert witnesses. Thus, the examination by Dr. Nagi did not satisfy the requirements of fundamental due process.[12]
*450 When the trial court denied Morris's motion for funds to hire an independent expert, the trial court stated that Morris could subpoena Dr. Ackerson if his defense was that his intelligence was so low that he did not appreciate the criminality of his conduct at the time of the crime. (R. 21.) That Morris could have subpoenaed one of the mental-health experts who had already submitted her report and her conclusions to the trial court and to both parties in no way satisfied the due-process requirements in Ake. For the reasons stated in Smith v. McCormick, 914 F.2d 1153 (9th Cir.1990), and in Cowley v. Stricklin, 929 F.2d 640 (11th Cir.1991), discussed above, Dr. Ackerson was not acting as an independent expert on Morris's behalf and her availability by subpoena in no way satisfied the dictates of Ake. See Starr v. Lockhart, 23 F.3d 1280, 1289 (8th Cir.1994)("We also find the trial court's alternative finding, that Starr's due process right to expert assistance was satisfied by the court-ordered examination and by the defense's ability to subpoena the state examiners, to be erroneous on two grounds. First, the examination was not appropriate to Starr's needs. Second, the ability to subpoena a state examiner and to question that person on the stand does not amount to the expert assistance required by Ake." (emphasis added)).
When the trial judge denied Morris's request for funds to hire an independent psychologist, the facts were: that from February 1999 until January 2003 Morris's competency to stand trial was under investigation; that from February 2001 until January 2003, Morris had been declared by the trial court to be incompetent to stand trial; that the only full-scale IQ score reported in the record for Morris is 53, which is a score ranking "well below the first percentile" of the population (2nd Supp. C. 52); that the court's experts disagreed about Morris's IQ and his competency to stand trial; and that Morris had a substantial history of substance abuse and blackouts and was so intoxicated at the time of his arrest, a few hours after the murder, that the detective did not question Morris about the crime because he feared that Morris would not be able to understand everything the detective said to him. In spite of all of the foregoing evidence, the trial court denied funds for an independent mental-health expert, which resulted in Morris's withdrawing his mental-health defense. `In fact, Morris presented no defense during the guilt phase of his trial. Furthermore, based in part on the prosecutor's representations that Morris had signed certain letters and pleadings that were shown to her, Dr. Ackerson determined that Morris was not retarded. As a result of Dr. Ackerson's new testimony, defense counsel did not introduce Morris's IQ score of 53 into evidence at the penalty phase of the trial. The trial court found no mitigating factors, statutory or nonstatutory, relating to Morris's mental health to exist when it sentenced Morris to death.
The facts presented here illustrate precisely the type of case the Ake Court contemplated when it stated:
"The risk of error from denial of such assistance, as well as its probable value, is most predictably at its height when the defendant's mental condition is seriously in question. . . . . It is in such cases that a defense may be devastated by the absence of a psychiatric examination and testimony; with such assistance, *451 the defendant might have a reasonable chance of success."
Ake v. Oklahoma, 470 U.S. at 82-83, 105 S.Ct. 1087.
The record established that Morris's mental condition was seriously in question and was a substantial factor in his defense at the guilt phase and at the penalty phase of his trial. Morris was entitled to the assistance of an independent mental-health expert. The trial court's denial of the necessary assistance deprived Morris of due process and requires a reversal for a new trial.[13]
C. Error under Atkins v. Virginia, 536 U.S. 304 (2002)
Although the trial court's erroneous denial of Morris's request for funds for an independent mental-health expert mandates a reversal for a new trial, we note, additionally, that the evidence in the record currently before us reflects that a mental-health expert was vital to Morris's case in the sentencing phase as well as at the guilt phase.
In Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the United State Supreme Court held that execution of a mentally retarded defendant constitutes cruel and unusual punishment. The Court in Atkins did not establish guidelines for determining what a defendant must demonstrate in support of a claim of mental retardation nor has the Alabama Legislature done so. In Ex parte Perkins, 851 So.2d 453 (Ala.2002), the Alabama Supreme Court held that, to establish that he is mentally retarded, a defendant must prove that he has an IQ of 70 or below, that he has significant deficits in adaptive functioning, and that the deficits manifested themselves during the developmental period. In Morrow v. State, 928 So.2d 315 (Ala.Crim.App.2004), this Court suggested a procedure for determining whether a defendant was mentally retarded and, therefore, was ineligible for the death penalty. In Morrow, we specifically encouraged "trial courts to resolve[] mental-retardation issues before trial if at all possible in order to avoid the burden and expense of a bifurcated capital trial." 928 So.2d at 324. The record in this case demonstrates the rationale for that recommendation. At the conclusion of the February 20, 2003, hearing on Morris's motion for funds to hire a mental-health expert, all of the evidence and testimony in the record at that point indicated that Morris might be mentally retarded. Dr. Ackerson had reported that Morris obtained a full-scale IQ of 53, which is in the "moderately mentally retarded" classification. Although Dr. Nagi testified at the December 9, 2002, competency hearing that he disagreed with Dr. Ackerson's opinion that Morris was moderately mentally retarded and he disagreed with the opinion of DMH/MR that Morris was moderately mentally retarded and suffered from longstanding deficits in adaptive functioning, Dr. Nagi twice testified that Morris might be mildly mentally retarded. (Supp. R. 32, 33.)[14] The conflict in the testimony of the court's experts on this issue, alone, necessitated the appointment of a mental-health expert who could assist Morris in the preparation and presentation of his claim of mental retardation. Instead, the case proceeded to trial and Morris was unable to develop the claim at all.
*452 In spite of the conflict in the testimony, the State argues in its brief and claimed at oral argument before this Court that certain pleadings and letters in the record were "written by Morris," and that they establish that Morris could not be mentally retarded. The record, however, contains no proof that Morris wrote any of the pleadings or documents on which the State relies to refute the diagnosis of mental retardation.
The record reflects that, some time before the sentencing hearing, the prosecutor apparently presented Dr. Ackerson with the pro se, handwritten pleadings and the handwritten letters now contained in the record and he told Dr. Ackerson that Morris had written them. During the hearing held outside the jury's presence and before the sentencing hearing, Dr. Ackerson testified, under cross-examination by the prosecutor, that she assumed the items had been authored by Morris. She answered the prosecutor's question on this issue by stating, "I did ask you specifically  that I was going to make my opinion based on the assumption that these were written and produced by the defendant, right." (R. 657.) The prosecutor then made a proffer to the court that the State's handwriting "expert would testify they are signed by the defendant." (R. 657; emphasis added.) Based on her review of documents she had been told Morris had written and on her review of Dr. Nagi's report, Dr. Ackerson testified that the letters indicated that Morris had exaggerated his intellectual deficits during her evaluation of him, because someone in the moderate range of mental retardation could not have written the types of letters she was provided to review. (R. 654.)
The record does not support the State's assertion, which it made before trial to Dr. Ackerson and during trial to the court and which it continues to make on appeal, that Morris wrote the documents. The State proffered only that its expert would testify that he had signed them. This Court is well aware that pro se documents are frequently written by "jail house lawyers" on behalf of defendants who then sign their names on the documents. And yet it was this unsubstantiated assertion that led Dr. Ackerson to change her opinion about Morris's cognitive functioning. Because Morris had no independent mental-health expert of his own, Dr. Ackerson's change of opinion eviscerated his mental-retardation claim, and Morris did not present any testimony about his mental retardation at sentencing. This, the State noted before sentencing, had been its purpose. (R. 659.)[15]

Conclusion
The failure to grant Morris funds to hire an independent mental-health expert left him with no defense at the guilt phase of trial. Even though Morris had been declared incompetent by the trial court following a forensic evaluation that determined Morris had a full-scale IQ of 53, even though DMH/MR found that Morris had lifelong cognitive and adaptive deficits, even though Morris had a documented history of extensive substance abuse and was extremely intoxicated on the night of the murder, and even though Morris was treated with antipsychotic medication while he was at Taylor Hardin, he was forced to proceed to trial and was convicted *453 and sentenced to death without the assistance of an independent mental-health expert. This denial has violated Morris's fundamental due-process rights and the Supreme Court's holdings in Ake v. Oklahoma and Atkins v. Virginia.
While we are mindful of the fact that this case began with the 1997 murder of Miriam Rochester and that our reversal today of Morris's convictions will further lengthen the time before this case is finally resolved, we cannot ignore a denial of constitutional due-process rights that deprived Morris of the fair trial which he was due. Moreover, we are convinced that this case would not withstand the many levels of review in State and federal proceedings that would follow an affirmance by this Court.
For all of the reasons discussed above, we are compelled to reverse the convictions and sentence of death and remand the cause for further proceedings.
REVERSED AND REMANDED.
BASCHAB and WISE, JJ., concur.
SHAW, J., dissents, with opinion, which McMILLAN, P.J., joins.
SHAW, Judge, dissenting.
I believe that this case should be remanded for a hearing pursuant to Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002); however, given the present posture of this case, I would not reverse Morris's convictions and sentence.
Although in Issue VII of his initial brief Morris begins with a broad and general argument that he was entitled to a "mental health professional" (Morris's brief at p. 39), the only specific argument Morris makes regarding his mental health is that he was entitled to an independent expert on mental retardation because what he claims were state experts could not "consult with the defense and plan a strategy for presenting the evidence of Mr. Morris's mental retardation at sentencing." (Morris's brief at p. 43; emphasis added.) A fair reading of Morris's initial and reply briefs reveals, in my view, that he is not arguing on appeal that he was entitled to any expert assistance with relation to the guilt-phase of his trial. However, as the majority notes, the only request Morris made for expert assistance at trial was to assist him in presenting his defense of mental disease or defect at the guilt-phase of his trial. Therefore, I believe that the majority's reversal in this case is based on plain error. However, given the state of the record regarding Morris's alleged mental retardation, I believe it would be better to remand this case for a hearing to determine the constitutionality of Morris's death sentence under Atkins before reversing two capital convictions stemming from an eight-year-old murder on an issue that is not raised and is being noticed by this Court under the plain-error doctrine and that, if the trial court determines that Morris's death sentence is unconstitutional under Atkins, this Court would not reach under the general rules of preservation and waiver.
I also point out that the majority's reversal in this case appears to be based, at least in part, on the ground that Morris was entitled to an independent mental-health expert to assist him in presenting evidence of his mental retardation at the guilt phase of the trial. Whether mental retardation is a defense to a crime in Alabama appears to be an issue of first impression. Such an issue raises in my mind many questions, including the following: (1) Can mental retardation be so severe as to constitute a mental disease or defect under § 13A-3-1, Ala.Code 1975, and provide a complete defense to a criminal charge? and (2) If mental retardation is *454 not a mental disease or defect under § 13A-3-1, would evidence of mental retardation nevertheless be admissible to the extent that it could render a defendant unable to form a specific intent, similar to the admissibility of evidence of voluntary intoxication under § 13A-3-2(a), Ala.Code 1975, and thereby provide a partial defense, in light of Alabama's express repudiation of the diminished-capacity defense?[16] See, e.g., § 13A-3-1(a), Ala.Code 1975 (except as defined, "[m]ental disease or defect does not otherwise constitute a defense"); McGowan v. State, [Ms. CR-95-1775, December 12, 2003] ___ So.2d ___, ___ (Ala.Crim.App.2003) ("Alabama has expressly rejected the doctrine of diminished capacity.") See also Barnett v. State, 540 So.2d 810 (Ala.Crim.App.1988) (rejecting the appellant's claim that his mental defect, even if it did not rise to the level of insanity under § 13A-3-1, entitled him to a jury instruction on a lesser-included offense because it was analogous to intoxication and rendered him incapable of forming specific intent because, the Court held, his mental defect, if it did not amount to insanity, was merely a diminished-capacity defense not recognized under Alabama law).
The majority does not address these questions; although the majority's holding implies that it believes mental retardation may be a defense to a crime,[17] it does not state whether it believes mental retardation is a complete defense because it is a mental disease or defect under § 13A-3-1, or whether it believes mental retardation, despite Alabama's express repudiation of the diminished-capacity defense, should, or even can, negate specific intent, as intoxication may in some circumstances. I cannot agree to reverse two capital-murder convictions based on an issue of first impression that is being noticed for the first time by this Court under the plain-error doctrine without first giving the parties the opportunity properly to brief and argue the issue.[18]
For these reasons, I respectfully dissent.
McMILLAN, P.J., concurs.
NOTES
[1] Testimony at trial indicated that Rochester's house had been converted to a duplex, and that Russell used a back entrance to the house. (R. 199-200, 276.)
[2] A supplemental record was filed in this Court on November 26, 2003. Citations to that record will be designated "Supp. ___," and will include the relevant page numbers in the clerk's record or in the transcript.
[3] A second supplemental record was filed in this Court on December 10, 2003. Citations to that record will be designated "2nd Supp. ___," and will include the relevant page numbers in the clerk's record or in the transcript.
[4] This videotape was not introduced at trial and it is not a part of the appellate record.
[5] The addendum was stamped filed on July 23, 1999. The docket entry indicates the addendum was filed on July 19, 1999. (2nd Supp. C. 4.) The four-day discrepancy is not relevant to our resolution of the issue presented.
[6] The forensic evaluation report is dated January 31, 2002, but was stamped filed on file stamped October 28, 2002. (2nd Supp. C. 76.)
[7] Only the abbreviation for this psychological test was given in the forensic report.
[8] It appears that counsel misspoke and referred to the plea as "not guilty by reason of mental disease and depression." (Supp. R. 39.)
[9] The initial transfer occurred because Judge James Garrett retired.
[10] Dr. Nagi testified at the December 9, 2002, competency hearing that he believed Morris was only mildly mentally retarded or was perhaps of borderline intelligence, but he provided no testimony or report of another IQ score. (Supp. R. 32, 33.)
[11] In the "Data Sources" section of Dr. Nagi's report, Dr. Nagi listed medical records from Taylor Hardin, including "recent" physical and mental examinations. (2nd Supp. C. 79.) However, Dr. Nagi did not state when the evaluations purportedly occurred, nor did he refer to any of the results obtained. His testimony at the competency hearing appeared to be based on his interviews, the results of the TOMM, and the reports of staff members who observed Morris on the ward.
[12] Morris argued at the hearing on the motion for funds to hire a mental-health expert that Dr. Nagi was not independent and that he was, essentially, the State's expert. (R. 29.) The trial court disagreed. While we need not resolve this issue in order to determine that Morris was entitled to an expert to assist his defense, we note that the Alabama Supreme Court has stated, "[T]he trial court ordered that the defendant be transferred to the Taylor Hardin Secure Medical Facility for examination by State experts. The records generated by the Taylor Hardin staff were made available to the defendant's State-paid expert." Ex parte Wilson, 571 So.2d 1251, 1257 (Ala.1990).
[13] We are aware of the recent decision of the Alabama Supreme Court in Ex parte E.J.M., 928 So.2d 1081 (Ala.2005). That case is, however, distinguishable because it involved the rights of a juvenile at a transfer hearing.
[14] The State's brief quotes Dr. Nagi's testimony indicating that Morris could be mildly mentally retarded. (State's brief at 20.)
[15] Even if we had not found reversible error under Ake based on the trial court's denial of Morris's request for funds to hire a mental-health expert to assist him in presenting his defense at the guilt phase, we would have found, nonetheless, that the case would have to have been remanded for a hearing pursuant to Atkins to determine whether Morris was mentally retarded.
[16] Voluntary intoxication is not a defense to a crime, and because diminished capacity is not recognized in Alabama, the level of intoxication necessary to negate specific intent must rise to the level of insanity under § 13A-3-1. See Ex parte Bankhead, 585 So.2d 112, 121 (Ala.1991) ("The degree of intoxication necessary to negate specific intent and, thus, reduce the charge, must amount to insanity.").
[17] I note that despite holding that Morris was entitled to funds to hire an independent mental-health expert, at least in part, to assist him in presenting mental retardation as a defense at the guilt-phase of the trial, the majority does not hold that the trial court's granting of the State's motion in limine to preclude admission of any evidence of mental retardation at the guilt phase of the trial was error.
[18] I also note that neither of the parties has had an opportunity to address whether Morris made the threshold showing, after his initial evaluation by Dr. Ackerson (which both Morris and the majority concede was a comprehensive evaluation), necessary to require further, independent expert assistance in raising guilt-phase issues relating to insanity, intoxication, and mental retardation.